UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 23-11398-GAO

CURRENT LIGHTING SOLUTIONS, LLC,
Plaintiff,

v.

SIGNIFY HOLDING B.V. AND
SIGNIFY NORTH AMERICA CORPORATION,
Defendants.

OPINION AND ORDER
February 6, 2024

O'TOOLE, D.J.

Plaintiff Current Lighting Solutions, LLC ("Current") commenced this lawsuit against defendants Signify Holding B.V. and Signify North America Corporation (collectively "Signify"), seeking declaratory judgments of non-infringement as to eighteen Signify patents.[1] Shortly afterward, Signify brought substantive actions against Current alleging infringement of nine Signify patents—including seven at issue in this case—in the U.S. District Court for the District of Delaware and before the International Trade Commission. Before the Court is Signify's motion to dismiss, which asserts two grounds: (1) that the Court should decline to exercise jurisdiction under the Declaratory Judgment Act; or (2) if the Court retains jurisdiction, that Current's complaint fails under Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth herein, the Court declines to exercise jurisdiction over Current's declaratory judgment claims and therefore dismisses the case without reaching the Rule 12(b)(6) issue.

---

[1] US Patent Nos. 7,178,941; 7,262,559; 7,348,604; 7,542,257; 7,654,703; 7,670,038; 7,802,902; 7,866,845; 8,063,577; 8,246,200; 8,272,756; 8,629,631; 9,119,268; 9,159,521; 6,972,525; 7,256,554; 7,358,706; 7,737,643.

**I.**     **Background**

Current and Signify are both large manufacturers of lighting products. Current is a former subsidiary of General Electric Company. Signify was formerly known as Philips Lighting.

In June 2018, Signify contacted Current via email and alleged that Current's products practiced several of Signify's LED lighting patents. Signify sought to have Current obtain a license through Signify's LED patent licensing program. In response, Current disputed Signify's allegations and requested that Signify provide claim charts for the identified patents. Current also asserted that it believed Signify was in turn utilizing technology covered by Current's patents, a circumstance which would need to be accounted for in any potential licensing arrangement. These initial communications kicked off five years of more or less languid attempted negotiations between the parties in search of a mutually acceptable cross-licensing agreement. During this time, representatives of both companies communicated periodically through email, phone calls, and in-person meetings.

The parties exchanged three cross-licensing offers over the course of negotiations: two presented by Signify and one counterproposal by Current. Signify presented its first licensing proposal in March 2022, which Current rejected. In a December 2022 in-person meeting, the parties apparently recognized some progress in the negotiations and agreed that litigation "would be a waste of both parties' resources." (Decl. of Aaron Rugh, Ex. 1 at ¶ 13 (dkt. no. 24-26).) In March 2023, Current made a counteroffer after a Current representative had called Signify and stated "that a new cross-license counteroffer would be emailed . . . [and] emphasized that the purpose of his call was to ensure that Signify would not cancel the meeting after receipt of the counteroffer and rush to file suit." (Id. at ¶ 14.) Signify rejected the March 2023 counteroffer. On

May 15, 2023, Signify sent Current a new cross-license offer, and the parties discussed the proposal in a phone call.

At the end of the May 15 phone call, the parties scheduled a further meeting for June 5, 2023. According to Signify, a Current representative stated that Current would bring a counterproposal to the June 5 meeting.[2] On June 3, 2023—two days before the planned meeting—Current requested to delay the meeting to later in June, citing two reasons: a new CEO had recently taken office and the Current legal team had a busy upcoming week. Signify agreed to move the meeting to June 22, noting that postponing appeared "necessary in order for the parties to proceed." (Ex. 16 (dkt. no. 24-16).)

On June 22, 2023, less than thirty minutes before the scheduled meeting, Current emailed Signify to cancel the meeting and advise Signify that this declaratory judgment action had been filed. In its email, Current wrote that it was "disappointed" by Signify's most recent licensing offer and accused Signify of "creat[ing] an impasse," such that Current was left with "no choice but to seek judicial help." (Ex. 18 (dkt. no 24-18).) Current also wrote the following: "We will hold off on formally serving the Complaint in order to leave open a transition period, should you wish to present a more realistic licensing offer." Id. The email concluded with Current's statement that it would "vigorously defend against Signify's baseless claims and overwrought damages allegations." Id. No further direct communications between the parties ensued. In response, on July 14, 2023, Signify filed three complaints against Current for patent infringement: two in the

---

[2] Two Signify representatives—Aaron Rugh and Daniel Gaudet—who were present on the May 15, 2023, phone call have attested to this fact. Current does not actually dispute these accounts, but a Current representative who was a participant on the call has stated that he has "no recollection" of this commitment having been made. (Decl. of Tom Boyle at ¶ 9 (dkt. no. 51-6).)

District of Delaware and one with the International Trade Commission. After having been served by Signify, Current then served Signify with its complaint in this case.

In its three actions Signify asserts infringement of nine total patents,[3] seven of which overlap with the claims asserted in this case. The District of Delaware has stayed the two cases before it pending the outcome of the motion to dismiss before this Court. In addition, both the District of Delaware and this Court have granted motions to stay the claims that overlap with those made in the International Trade Commission action.

## II.  Discussion

### A.  Declaratory Judgment Act

The Declaratory Judgment Act confers on district courts "a unique breadth of . . . discretion to decline to enter a declaratory judgment." Wilton v. Seven Falls Co., 515 U.S. 277, 287 (1995). So long as a court "acts in accordance with the purposes of the Declaratory Judgment Act and the principles of sound judicial administration, [it] has broad discretion to refuse to entertain a declaratory judgment action." Commc'ns Test Design, Inc. v. Contec, LLC, 952 F.3d 1356, 1361-62 (Fed. Cir. 2020) (internal citation omitted). The objective of the Declaratory Judgment Act in patent cases is to "provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights." Goodyear Tire & Rubber Co. v. Releasomers, Inc., 824 F.2d 953, 956 (Fed. Cir. 1987). The Act enables a party "reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side." BP Chemicals Ltd. v. Union Carbide Corp., 4 F.3d 975, 977 (Fed. Cir. 1993). To determine whether a lawsuit accords with the purposes of the Declaratory Judgment

---

[3] Current has also filed a counterclaim in the District of Delaware, asserting that Signify has infringed one of Current's patents. In response, Signify filed a counterclaim seeking a declaratory judgment of non-infringement and invalidity of the Current patent in question.

Act, "a court may take into account the pendency of serious negotiations to sell or license a patent" and may find "that the need for judicial relief is not as compelling as in cases in which there is no real prospect of a non-judicial resolution of the dispute." EMC Corp. v. Norand Corp., 89 F.3d 807, 814 (Fed. Cir. 1996).

Signify argues that Current's conduct leading up to the filing of this lawsuit demonstrates that Current acted in bad faith in an attempt to catch Signify off-guard by filing first and upping the ante in the ongoing licensing negotiations. This Court agrees. The record strongly indicates that Current's motivation for this declaratory judgment action was a tactical attempt to gain litigation and negotiation advantages. As Signify argues, two facets of the record support this conclusion: (1) Current's choice first to delay, and subsequently to cancel at the last moment, the June 2023 meeting in which Signify had expected to receive a realistic counteroffer; and (2) the email from Current that not only informed Signify of the lawsuit, but which also can fairly be seen as an attempt to obtain bidding leverage in further negotiations.

> i. *Interference with Negotiations*

A court may decline to exercise jurisdiction if it determines that a declaratory judgment action is intended to interfere with good-faith, ongoing negotiations. Contec, 952 F.3d at 1364. "[I]t would be inappropriate to reward—and indeed abet—conduct which is inconsistent with the sound policy of promoting extrajudicial dispute resolution, and conservation of judicial resources." EMC, 89 F.3d at 814 (quoting Davox Corp. v. Digital Sys. Int'l, Inc., 846 F. Supp. 144, 148 (D. Mass. 1993)).

Signify asserts that it believed that so long as the parties continued to schedule meetings, litigation could therefore be avoided. For example, Signify points to assurances from Current that

the parties apparently had "agreed that litigation . . . would be a waste of both parties' resources." (Decl. of Aaron Rugh, Ex. 1 at ¶ 13.)

Signify argues that, viewed in the context of the years-long negotiating relationship between the parties, Current acted in bad-faith by promising to make a counteroffer in a subsequent meeting, despite having already decided to file this lawsuit. The choice to "string [a defendant] along just long enough to get the judicial drop and file [a] lawsuit" is inconsistent with the purposes of the Declaratory Judgment Act. See Contec, 952 F.3d at 1364 (internal citation omitted).

## ii. Tactical Negotiation Advantage

The objectives of the Declaratory Judgment Act are not furthered when a lawsuit is filed for the purpose of strengthening a party's bargaining position in ongoing negotiations. EMC, 89 F.3d at 815; Contec, 952 F.3d at 1364. Current, in its email informing Signify of its lawsuit, sought to use the suit to leverage its bargaining power in future negotiations by timing the filing of its action to enhance its negotiation stature, rather than to clarify its legal rights and liabilities.

In EMC, the Federal Circuit affirmed the district court's determination that a lawsuit was intended to improve negotiation leverage where, after filing but not serving its complaint, plaintiff EMC informed the opposing party of the lawsuit but insisted that negotiations would continue, clarifying that the action was "merely a defensive step" filed "to protect themselves first and continue discussions." See EMC, 89 F.3d at 815. The court held that "under these circumstances, the district court could properly view the declaratory judgment complaint as a tactical measure filed in order to improve EMC's posture in the ongoing negotiation—not a purpose that the Declaratory Judgment Act was designed to serve." Id. Conversely, in Sony Elecs., Inc. v. Guardian Media Techs., Ltd., the Federal Circuit did "not think it appropriate to infer that [a party] . . . filed [its] suit as an intimidation tactic to gain leverage in any future negotiations" where "unlike in

6

EMC, there [was] no affirmative evidence" to that effect—such as an invitation for further offers directed to the opposing party—and where the district court had largely relied on the lawsuit's potential negotiation effect. 497 F.3d 1271, 1289 (Fed. Cir. 2007) ("Even if these suits have had the effect of [resulting in] a more favorable negotiating position, that effect is not a sufficient reason to decline to hear the suit.").

As in EMC, Current was attempting to use its lawsuit as leverage in anticipated ensuing negotiations with Signify. Current argues that its conduct is distinguishable from that at issue in EMC because, unlike EMC, it did not state that its lawsuit was merely defensive, writing that it would "vigorously" pursue this case. (Ex. 18 (dkt. no 24-18).) But, although the precise words used were different, the message was the same as in EMC: Current sought procedural advantage to gain the upper hand in subsequent negotiations. Current's initiation of this action had a tactical motivation that does not serve the proper objectives of the Declaratory Judgment Act.

B.  First-to-File Rule

Because Signify subsequently filed infringement lawsuits against Current, it is necessary to address the potential application of the "first-to-file" rule. A district court may not "dismiss a declaratory judgment action merely because a parallel patent infringement suit was subsequently filed in another district; to take such action without any other reasons . . . would be contrary to the general rule favoring the forum of the first-filed action." EMC, 89 F.3d at 813.

As with the decision of whether to entertain a declaratory judgment action, district courts possess considerable discretion to depart from the first-to-file rule. Contec, 952 F.3d at 1362. Indeed, in a case like this, where "one of two competing suits in a first-to-file analysis is a declaratory judgment action, district courts enjoy a 'double dose' of discretion: discretion to

decline to exercise jurisdiction over a declaratory judgment action *and* discretion when considering and applying the first-to-file rule and its equitable exceptions." Id.

Exceptions to the first-to-file rule "are not rare." Micron Tech., Inc. v. Mosaid Techs., Inc., 518 F.3d 897, 904 (Fed. Cir. 2008). For example, a first-filed declaratory judgment lawsuit that contravenes the legitimate purposes of the Declaratory Judgment Act, may "warrant[] departure from the first-to-file rule." See Contec, 952 F.3d at 1363. As discussed above, Current's lawsuit does not satisfactorily comport with the objectives of the Declaratory Judgment Act, providing a justification for dispensing with the rule.

### III. Conclusion

For the foregoing reasons, the defendants' Motion to Dismiss (dkt. no. 22) is GRANTED, and the case is DISMISSED WITHOUT PREJUDICE.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge